Filed 2/9/22  P. v. Gillard CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B301605 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. PA088987 |
| v. | |
| TERRY TERRELL GILLARD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Hayden Zacky, Judge.  Affirmed.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Colleen M. Tiedemann, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

A jury found Terry Terrell Gillard guilty of committing numerous sex crimes against minors while he was a youth wrestling coach.  On appeal, Gillard contends the court erred by finding him competent to stand trial, denying his motion to sever counts related to one of the victims, and excluding impeachment evidence.  He also argues the court was biased and the prosecutor engaged in prejudicial misconduct.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

1.    ***The charged crimes***

The People charged Gillard with 47 sex crimes involving nine minors.[1]  Most of the charges arose out of incidents taking place between 2014 and 2017, when Gillard was the wrestling coach at the Boys and Girls Club and Polytechnic High School (Poly).  Eight of the nine victims were members of the Poly wrestling team.  The People also charged Gillard with three counts related to an incident that occurred in 1991.

2.    ***The prosecution's case***

a.    *Incident involving Abraham (counts 1–3)*

Abraham A. joined a youth wrestling team in 1989, and Gillard was his coach.  In August 1991, right before Abraham's

---

[1]    The specific counts are as follows:  three counts of lewd act upon a child under the age of 14 years (Pen. Code, § 288, subd. (a); counts 1–3); three counts of lewd act upon a child between 14 and 15 years (Pen. Code, § 288, subd. (c)(1); counts 4, 23–24); three counts of oral copulation of a person under 18 years (Pen. Code, § 288a, subd. (b)(1); counts 5, 20, 22); 28 counts of procuring a child to engage in a lewd act (Pen. Code, § 266j; counts 6–9, 11, 13–16, 21, 25–42); and 10 counts of child molesting (Pen. Code, § 647.6, subd. (a)(1); counts 10, 12, 17–19, 43–47).

12th birthday, Gillard drove to his house and said he had a birthday gift for him. Abraham got into the front seat of Gillard's Cadillac. A woman, who Abraham believed was the mother of another boy on the wrestling team, was sitting in the backseat.

Gillard parked his car a few blocks from Abraham's house. He handed Abraham a condom and said, "today, you're going to get your cherry popped." Abraham moved to the backseat of the Cadillac. The woman orally copulated Abraham and they had sex while Gillard watched from the front seat. After Abraham ejaculated, Gillard climbed into the backseat. Gillard started having sex with the woman while she orally copulated Abraham. Abraham eventually put on his clothes and got into the front seat, where he waited for Gillard and the woman to finish.

Abraham was initially proud and felt like he had become a man. He boasted about what happened to his siblings and best friends. Over time, however, he felt ashamed and guilty. Abraham started acting out and his grades suffered.

In 2017, Abraham learned that Gillard had been arrested for lewd conduct with minors. He decided to report the incident to the police because he wanted to protect other children.

b.      *Incidents involving Kayla (counts 4, 5)*

Kayla L. joined the Poly wrestling team in 2015, and Gillard was her coach. Kayla and Gillard often spoke on the phone. At first, they talked about wrestling and school, but Gillard eventually started asking her sexual questions.

When Kayla was 14 years old, Gillard invited her to be the team's manager and join the "circle," which was a group of his most trusted wrestlers. Gillard, however, said he needed to "vet" her first. Gillard drove to Kayla's house, took her into

3

her bedroom, and locked the door.  He undressed Kayla, touched her breasts and vagina, put his mouth on her vagina, and put his penis inside her vagina.  Kayla cried and told him to stop. Gillard told Kayla to copulate him orally, but she refused.

Gillard eventually put on his clothes.  He told Kayla she had been "vetted" and was now a member of the circle.  After that day, Gillard frequently groped Kayla's breasts and vagina, both over and under her clothing.

When Kayla was around 14 or 15 years old, Gillard drove her to his house after school.  He took her into his bedroom, put his fingers inside her vagina, and put his mouth on her vagina.

c.    *Incidents involving Kayla, Ivan, and Tiel (counts 6–8)*

Gillard was Ivan S.'s wrestling coach at the Boys and Girls Club and Poly.  When Ivan was 14 years old, Gillard told him Kayla wanted to perform oral sex on him in the school's "mat room."  Ivan was hesitant, but Gillard pressured him. Ivan went into the mat room with Kayla, but he did not want to have sex with her.  Ivan instead jumped around the room to make it appear that he was sweaty from having sex.

After Ivan left the mat room, Gillard groped Kayla's vagina over her clothes.  He then told her to have sex with another wrestler, Tiel.  Gillard warned Kayla that if she did not have sex with Tiel, he would have sex with her instead.

Tiel came into the room, pulled down Kayla's underwear, and inserted his penis into her vagina, which was painful and caused Kayla to bleed.  Kayla tried to clean the blood off the floor before she left the mat room.  She saw Gillard laughing after he noticed her blood on Tiel's shirt.

4

d. *Incidents involving Kayla and David (counts 9–12)*

David S. met Gillard when he was 13 years old and wrestling at the Boys and Girls Club. David later joined the Poly wrestling team.

When David was 15 years old, Gillard took him to Kayla's house and told him to have sex with her, which he did. Another time, Gillard drove David and Kayla to his house. Gillard left them in his garage and said he would return when they were finished having sex. David and Kayla had sex, and then Gillard drove them home.

e. *Incidents involving Kayla and Andy (counts 13, 14)*

Andy joined the Poly wrestling team in the ninth grade. When Andy was 15 years old, Gillard drove him to Kayla's house and told him to "vent off some frustration" by "screw[ing]" Kayla. Andy and Kayla did not have sex; instead, they talked about how they felt ashamed.

A week or two later, Gillard again dropped Andy off at Kayla's house and told him to "let it all out." Andy was scared and felt pressured by Gillard. Andy and Kayla eventually had sex in her bedroom.

f. *Incidents involving Kayla, Jaslyn, and Tiel (counts 15, 16)*

In July 2015, Gillard brought Tiel and another Poly wrestler, Jaslyn A., to Kayla's house. Gillard told them to have a threesome, and he became angry when they refused. Jaslyn was scared, so she hid under the bed and started crying. Gillard eventually left the house with Jaslyn.

5

g.   *Incidents involving Kayla, Ivan, and Norman (counts 17–19)*

Norman R. joined the Poly wrestling team in the ninth grade. When Norman was 15 or 16 years old, Gillard drove him and Ivan home from practice. On the way, Gillard called Kayla and said he had two "studs" for her. Gillard drove Norman and Ivan to Kayla's house and told them to go inside her room through a window, which they did. Ivan and Norman did not want to have sex with Kayla, so they made up an excuse and left after a few minutes.

h.   *Incidents involving Kayla and Adrian (counts 20–22)*

Adrian V. joined the Poly wrestling team his freshman year. When Adrian was 14 years old, he attended a party with Gillard and several members of the wrestling team. At the party, Gillard told Kayla to "vet" Adrian. Kayla understood Gillard to mean he wanted her to have sex with Adrian. Kayla orally copulated Adrian and they had sex while Gillard watched. Gillard told Adrian, "Congratulations. You're officially part of the circle." After Adrian left the room, Gillard put his mouth on Kayla's vagina.

i.   *Incidents involving Jaslyn (counts 23, 24, 43–47)[2]*

Jaslyn joined the Poly wrestling team in 2013, when she was 14 years old. Gillard was initially kind to Jaslyn, and he made her the team captain. At some point, he started driving Jaslyn home after wrestling practices.

Toward the end of her ninth grade year, Gillard told Jaslyn she had a "fat ass," which made her uncomfortable. He started calling her on the phone every day and would ask her sexual

---

[2]   The prosecutor charged Gillard in counts 45 and 46 with an incident related to Jaslyn and Ivan.

questions.  He would also kiss Jaslyn on the cheek, very close to her mouth.

When Jaslyn was 15 years old, Gillard drove her home from practice and told her they were going to have sex.  He put his hand inside her pants and touched her vagina.  He then took her hand and put it on his erect penis.  Jaslyn was scared and pulled her hand away.

In April 2016, when Jaslyn was 16 years old, Gillard said he did not trust her and needed to test her.  He kissed her on the mouth and touched her thigh and vagina.

When Jaslyn when 17 years old, Gillard told her to meet him alone because she needed to do the ultimate test.  Jaslyn was scared, so she brought Ivan with her.  Gillard told Jaslyn and Ivan to have sex in his car.  Jaslyn and Ivan did not want to have sex, so they faked it.  Gillard dropped off Ivan at home.

While driving Jaslyn home, Gillard started touching her body.  Jaslyn used her phone to record three videos of Gillard, which the prosecutor played for the jury.  One of the videos depicted Gillard touching Jaslyn's thigh and vaginal area.  Jaslyn said, "Sir, can you please stop, you're my coach," to which Gillard replied, "You better get that fucking damn camera out of my face."

The next morning, Jaslyn told her principal what Gillard had done, and the principal called the police.  Jaslyn gave her principal her phone, which contained the videos of Gillard touching her.

j.      *Incidents involving Jaslyn and Andy (counts 25–30)*

Gillard made Jaslyn and Andy have sex several times, often in front of other students.  In December 2014, when Jaslyn was 15 years old and Andy was 14 years old, Gillard drove them

7

home from a Christmas party and told them to have sex. Jaslyn did not want to have sex with Andy, but she was scared. Andy was hesitant at first, but he and Jaslyn eventually had sex while Gillard watched through the rear-view mirror. After they finished, Gillard said "damn, girl," and he seemed proud.

Another time, Gillard drove Jaslyn and Andy back from a tournament in La Puente in a van belonging to the Boys and Girls Club. Gillard told Jaslyn and Andy to have sex in the van, which they did. On another occasion, Gillard told Jaslyn to have sex with Andy during a team picnic at El Cariso park. Jaslyn and Andy had sex in the Boys and Girls Club van in front of other members of the wrestling team.

k.      *Incidents involving Jaslyn and Miguel (counts 31–42)*

Miguel C. joined the Poly wrestling team in the tenth grade, and Gillard was his coach. Gillard made Miguel and Jaslyn have sex 30 or 40 times. The first time, Gillard told them to have sex while he was driving them home from practice. They eventually had sex in the backseat of the Boys and Girls Club van.

Another time, Gillard was driving Jaslyn, Miguel, and several other students home in his Cadillac. After dropping off one student, he told Jaslyn and Miguel to have sex, which they did. Gillard and two students, Brenda and Janet, were in the front seat.

On another occasion, Gillard was driving Jaslyn, Miguel, and Ivan to a tournament in the Boys and Girls Club van. Jaslyn had not made her weight class for the tournament. Gillard told her to lose weight by having sex with Miguel, which she did.

Another time, Gillard drove Jaslyn, Miguel, and Brenda home from Gillard's brother's house. He asked Jaslyn and

8

Miguel if they would have a threesome with Brenda, but they refused.  Gillard became upset.  He dropped off Brenda and then told Jaslyn and Miguel to have sex while he drove, which they did.

Gillard also made Jaslyn and Miguel have sex in the back of his black Mitsubishi.  Gillard watched them from the front seat.

l.      *DNA evidence*

Police recovered sperm from the backseat of Gillard's car.  The sample contained Miguel's and Jaslyn's DNA.  Police also recovered sperm from several locations in Gillard's garage, but none of the samples contained DNA from Gillard or any of the victims.

m.      *Expert testimony*

The People presented expert testimony from Judy Ward on Child Sexual Abuse Accommodation Syndrome (CSAAS).  Ward testified there are five components to CSAAS:  secrecy, helplessness, accommodation, delayed disclosure, and retraction.  According to Ward, CSAAS can help to explain an abused child's reactions, but it is not a diagnostic tool.

**3.      *The defense's case***

Gillard's theory of the case was that the victims, led by Jaslyn, devised a plan to accuse him of sexual misconduct in order to obtain a financial award or settlement.  Gillard also asserted the prosecutor used leading and suggestive questions during interviews with the victims, which may have implanted memories in their minds or led them to make false accusations.  In support of these theories, Gillard presented the following evidence.

According to Sedrick Azurdia, Ivan claimed Jaslyn and her attorneys told everyone to get together because they had a million dollar case against Gillard. Ivan also said Gillard did not molest him.

Humberto Parra asked Miguel whether Gillard touched him, and Miguel replied "no." Parra said, "you really ruined a man's life," to which Miguel responded, "I know I did." Miguel said he "wanted out" because his mother had a serious health condition.

Jordan C., who wrestled for Gillard at Poly and the Boys and Girls Club, was in a group text message with Norman and Ivan in September 2017. Ivan claimed he missed Gillard and regretted "going along with the whole thing." Ivan said, " 'It's all Jaslyn's fault. We went along with it because she said it.' " Norman agreed.

Pedro S. wrestled for Gillard from 2013 through 2017. During an interview with the prosecutor and a detective, Pedro denied that Gillard ever directed him to engage in sexual activities with another student. The prosecutor told Pedro she knew he was lying and they found his DNA in semen samples, which was not true. At one point, the detective told the prosecutor to calm down while questioning Pedro.

John Paez started a youth wrestling club with Gillard, and he was one of Abraham's coaches. Paez was not aware of any sexual conduct between Gillard and Abraham. Once during a get-together at Gillard's house, Paez stopped Abraham and a group of boys from having sex with a clearly intoxicated girl.

Gillard also presented testimony from numerous coaches, parents, and students who claimed they never witnessed Gillard engage in any inappropriate conduct with students. Several

10

witnesses also testified that Jaslyn had access to Gillard's car, which would explain how her and Miguel's DNA ended up in the backseat.

In addition, Gillard presented expert testimony from Matthew Gabler, who testified about unexplained metadata connected to Jaslyn's videos. Gillard also presented expert testimony from a psychologist, Mitchell Eisen, about the limitations of CSAAS and the risks of suggestibility during witness interviews. Eisen testified that the tone of voice of the interviewer, the use of leading questions, and calling someone a liar can impact witness statements. According to Eisen, minors are particularly vulnerable to influence, and coercive questioning methods can result in increased suggestion.

### 4. *Verdict and sentencing*

The jury deliberated for about a day before convicting Gillard as charged. The court imposed an aggregate sentence of 71 years. The court ordered Gillard to pay direct victim restitution, and it imposed various fines and fees.

Gillard timely appealed.

## DISCUSSION

### 1. *Competency issues*

Gillard argues he was incompetent to stand trial, and the trial court erred in finding otherwise. He also contends the trial court prejudged the competency issue, which violated his constitutional right to an impartial judge.

#### a. *Background*

##### i. Pre-competency hearing proceedings

On March 18, 2019, the court held a pretrial hearing to consider the parties' motions to exclude evidence. At the hearing, defense counsel declared a doubt as to Gillard's competency

11

to stand trial.  Counsel submitted a report from Dr. Abraham Argun, in which the doctor concluded—based on a "brief neurocognitive/neuropsychological screening"—it was highly probable Gillard was suffering from "cognitive deterioration . . . raising questions . . . about his competency to stand trial at this time."  Dr. Argun did not sign the report under penalty of perjury.

After reviewing Dr. Argun's report and discussing the matter with defense counsel in camera, the trial court asked Gillard a series of questions to gauge his competency.  Gillard successfully answered the court's questions regarding his name and birthday, the date, where he was being housed, and how long he had been in custody.  Gillard did not know the particular counts he was charged with, but he understood the basic allegations against him.  He was able to identify defense counsel and the judge, as well as their roles in the case.  The court concluded, based on its interactions with Gillard and Dr. Argun's report, that Gillard was not mentally incompetent to proceed with trial.

A few days later, on March 22, defense counsel argued Dr. Argun's report constituted substantial evidence sufficient to compel a full evidentiary hearing on the competency issue. The court said it would review the relevant law and revisit the issue in the next few days.  The court then began time-qualifying jurors and considering their hardship claims.

On March 26, defense counsel filed an objection to the court's competency finding, along with a declaration from Dr. Argun.  In response, the court appointed Dr. Haig Kojian to examine Gillard the next morning.  Gillard then waived his right to a jury trial on the competency issue, and defense counsel

joined the waiver.  Defense counsel asked the court to suspend proceedings, but the court declined to do so until it heard from Dr. Kojian.

Dr. Kojian examined Gillard for about an hour the morning of March 27, after which he informed the court Gillard was competent to stand trial.  The court nevertheless suspended proceedings pending a competency hearing.  The court explained that, after giving more thought to the issue, it determined it should have suspended proceedings when it received Dr. Argun's declaration the previous day.  The court noted it could issue an order retroactively suspending proceedings to that point, but it would have little practical effect.

Defense counsel then moved to withdraw the jury waiver on the competency issue.  Counsel said he had serious concerns that the court had prejudged the issue given its earlier remarks that it believed Gillard was competent.

The court denied counsel's request to withdraw the waiver. The court explained that, until it received Dr. Argun's declaration, it had an obligation to make its own threshold finding of competency.  The court also expressed concern that a jury trial on the competency issue would cause a long delay. It noted the witnesses had been subpoenaed for the underlying trial and there had been significant progress in jury selection. Specifically, the court had already time-qualified almost 250 jurors to serve on a trial that it estimated to last several weeks.

The next day, defense counsel objected to the court acting as factfinder at the competency hearing.  Counsel argued the court made statements indicating its goal was to "get[ ] the competency issue out of the way so the jury would not be inconvenienced."  The court construed the objection

13

to be a motion to disqualify under Code of Civil Procedure section 170.3, which it struck after finding no legal grounds for disqualification.

### ii. The competency hearing

The court held a competency hearing on March 28, at which Dr. Argun and Dr. Kojian testified as follows.

Dr. Argun, who is a forensic clinical psychologist, spent seven hours interviewing Gillard and conducting tests. Dr. Argun diagnosed Gillard with a cognitive disorder not otherwise specified (NOS), and he opined that Gillard was not competent to stand trial. He reached this conclusion after scoring the various tests, and he would not have come to the same conclusion had he simply spoken to Gillard.

Although Dr. Argun found Gillard to have an IQ of 85, which is on the low side of normal, he concluded Gillard's ability to think abstractly was at the level of a ten-year-old boy. Dr. Argun observed that Gillard's mood, concentration, and attention varied frequently, he had difficulty with abstract concepts and problem solving, and he often rambled, which showed tangential thinking.

Dr. Argun also observed issues with Gillard's memory. Gillard, for example, had difficulty remembering a six-line short story. He also could not explain the roles of the court, defense counsel, and the prosecutor, despite Dr. Argun explaining them to him a half hour earlier.

Dr. Argun testified that Gillard's cognitive impairment was progressive and the observable symptoms should have appeared earlier than the last two weeks. The condition would have been "going on for some time," at least in the "last five, six, ten years."

14

Dr. Haig Kojian, who is a forensic psychologist, interviewed Gillard for about an hour.[3] He also reviewed Dr. Argun's report, Dr. Argun's raw notes and testing data, hearing transcripts, and police reports.

Dr. Kojian opined that Gillard was competent to stand trial. He found Gillard to be a "pleasant and adult level individual," and he saw no signs that Gillard had the mental capacity of a 10-year-old child. Dr. Kojian noted that Gillard's thinking was intact, linear, and on topic. He answered the doctor's questions without difficulty, his speech was not impaired, and he had no memory problems. Gillard, in fact, recalled detailed information from his past with remarkable accuracy. Gillard also appreciated the seriousness and gravity of his situation, and he was able to identify the names and roles of the judge, defense counsel, and the prosecutor.

Dr. Kojian did not agree with Dr. Argun's diagnosis of a cognitive disorder NOS, which he noted was made under an older version of the Diagnostic and Statistical Manual of Mental Disorders (DSM). Dr. Kojian did not see any signs that Gillard suffered from a cognitive disorder found in the current version of the DSM.

### iii. The court's decision

The court found Gillard was competent to stand trial. The court explained it was undisputed Gillard did not suffer from a mental illness and did not have a developmental defect or disorder. He has an I.Q. within the normal range, held down regular jobs throughout his life, was a high school wrestling

---

[3] Dr. Kojian submitted a written report that generally tracked his testimony at the hearing.

coach, lived with his spouse for 40 years, and raised a child.  He exhibited no abnormal or bizarre behavior in court, and he was able to answer the court's questions regarding the proceedings against him.  Dr. Kojian, moreover, testified that Gillard does not have any cognitive defects and has an excellent memory.

The court also noted that any impairment should have been apparent to defense counsel—who had been representing Gillard for more than a year—well before he raised the issue with the court.  Further, although Dr. Argun testified that Gillard could not identify the attorneys and judge or their roles, he subsequently was able to do so in court and during his interview with Dr. Kojian.

b. *Substantial evidence supports the court's competency finding*

The due process guarantees of both the federal and state Constitutions forbid the trial of a criminal defendant while he is mentally incompetent.  (*People v. Buenrostro* (2018) 6 Cal.5th 367, 385.)  Under Penal Code section 1367,[4] a defendant is mentally incompetent " 'if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' " (*Buenrostro*, at p. 385.)  "The law presumes a person is competent to stand trial.  ([ ] § 1369, subd. (f).)  'When the defendant puts his or her competence to stand trial in issue, the defendant bears the burden of proving by a preponderance of the evidence that he or she lacks competence.' " (*Id*. at p. 387.)

---

[4]     Undesignated statutory references are to the Penal Code.

16

On appeal, "a finding of competency to stand trial 'cannot be disturbed if there is any substantial and credible evidence in the record to support the finding.' " (*People v. Hightower* (1996) 41 Cal.App.4th 1108, 1111.) "[A]n appellate court must view the record in the light most favorable to the verdict [that a defendant is mentally competent] and uphold the verdict if it is supported by substantial evidence." (*People v. Marshall* (1997) 15 Cal.4th 1, 31.) "Evidence is substantial if it is reasonable, credible, and of solid value." (*Ibid.*)

Here, there is substantial evidence supporting the trial court's finding that Gillard was competent to stand trial. Although Dr. Argun diagnosed Gillard with a cognitive disorder, Dr. Kojian found his thinking was intact, linear, and on topic, he was able to answer questions without difficulty, and his speech was not impaired. Dr. Kojian did not observe any problems with Gillard's memory, and he noted that Gillard could recall detailed information about his past. In response to the court's and Dr. Kojian's questioning, Gillard was able to identify the names and roles of the judge, defense counsel, and the prosecutor. He also knew the general nature of the charges against him, and, according to Dr. Kojian, appreciated the seriousness and gravity of his situation. In light of this evidence, the court could reasonably conclude Gillard understood the nature of the criminal proceedings and was capable of assisting his counsel in a rational manner.

Gillard insists the trial court was required to credit Dr. Argun's opinion over Dr. Kojian's given Dr. Argun spent more time with Gillard, interviewed him face-to-face, and performed a variety of tests on him. We disagree. Gillard overlooks that Dr. Kojian reviewed Dr. Argun's report—including

17

the results of Dr. Argun's tests—before he formed his opinion. Dr. Kojian also briefly reviewed Dr. Argun's raw notes and data. Neither changed his opinion that Gillard was competent to stand trial.

Gillard also overlooks the evidence contradicting many of Dr. Argun's observations and test results. Dr. Argun's opinion was premised in large part on his observations that Gillard rambled and had problems with his short-term memory. On the latter point, Dr. Argun cited Gillard's failure to memorize a short story and recall information about the court process a half hour after Dr. Argun explained it to him. Dr. Kojian, however, found Gillard's thinking was intact and linear, and he did not observe any problems with Gillard's memory. Moreover, contrary to Dr. Argun's claims, Gillard was able to retain information about the court process, as he correctly answered Dr. Kojian's and the court's questions on the topic several days after his interview with Dr. Argun.

Further, despite Dr. Argun's testimony that Gillard's cognitive impairment would have been "going on" for at least five to ten years, the defense presented little evidence showing he displayed symptoms over that time period. As the court aptly noted, defense counsel had been representing Gillard for more than a year, yet raised a doubt about his competency only on the eve of trial. On this record, the court could reasonably reject Dr. Argun's opinion that Gillard was suffering from a cognitive impairment that rendered him incompetent to stand trial.

In passing, Gillard suggests the trial court improperly relied on his lack of outbursts in the courtroom and his ability to answer questions about the proceedings. According to Gillard, a court's colloquy with a defendant is not sufficient to find him

18

competent to stand trial.  The court, however, did not rely solely on its own observations and interactions with Gillard.  And contrary to Gillard's suggestions, a trial court may properly consider its own observations, and weigh them against expert reports and other available evidence.  (*People v. Rodas* (2018) 6 Cal.5th 219, 234.)

We also reject Gillard's brief contention that the trial court ignored his evidence and gave insufficient weight to defense counsel's opinion that he was incompetent.  Where, as here, "our review of the record shows that there is substantial evidence to support the judgment, we must affirm, even if there is also substantial evidence to support a contrary conclusion and the [trier of fact] might have reached a different result if it had believed other evidence." (*People v. Riley* (2015) 240 Cal.App.4th 1152, 1165–1166; see *People v. Mendoza* (2016) 62 Cal.4th 856, 883 [when reviewing a competency finding, the reviewing court does not substitute its judgment for that of the trier of fact or reweigh the evidence].)

c.    *The trial court did not deny Gillard the right*
      *to an impartial judge*

A "[d]efendant has a due process right to an impartial trial judge under the state and federal Constitutions.  [Citations.] The due process clause of the Fourteenth Amendment requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of the case." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111.)  "On appeal, we assess whether any judicial misconduct or bias was so prejudicial that it deprived defendant of ' "a fair, as opposed to a perfect, trial." ' " (*Id*. at p. 1112.)

19

Gillard argues the trial court violated his right to due process by prejudging the competency issue.[5] He insists the trial court's bias is evident from the fact that it refused to declare a doubt as to his competency and suspend proceedings immediately after receiving Dr. Argun's report. We disagree.

In support of its decision not to suspend proceedings immediately, the trial court cited *People v. Sattiewhite* (2014) 59 Cal.4th 446. In that case, the Supreme Court explained that a court has an obligation to suspend proceedings only if defense counsel "present[s] expert opinion from a qualified and informed mental health expert, *stating under oath* and with particularity that the defendant is incompetent, or counsel [makes] some other substantial showing of incompetence that supplements and supports counsel's own opinion." (*Id.* at p. 465, italics added.) Because Dr. Argun did not sign his report under oath, the trial court believed it had an obligation independently to assess Gillard's competency. Based on Gillard's responses to the court's questions, it reasonably concluded he was competent and refused to suspend the proceedings. Shortly after the court received

_____

[5] We reject the Attorney General's contention that Gillard forfeited this issue by failing to seek writ review of his motion to disqualify, as required under Code of Civil Procedure section 170.3. Our Supreme Court has explained that, "notwithstanding the exclusive-remedy provision of Code of Civil Procedure section 170.3, 'a defendant may assert on appeal a claim of denial of the due process right to an impartial judge.' [Citation.]" (*People v. Panah* (2005) 35 Cal.4th 395, 445, fn. 16; see *People v. Chatman* (2006) 38 Cal.4th 344, 363 [considering the defendant's constitutional challenge asserting judicial bias, even though the defendant did not file a writ petition].) Here, Gillard's claim arises out of his constitutional right to due process.

a declaration from Dr. Argun, it set a competency hearing, appointed an expert to interview Gillard, and suspended proceedings. On this record, we see nothing to suggest the court was biased or had prejudged the competency issue.

Gillard contends that under *People v. Tomas* (1977) 74 Cal.App.3d 75, the court was required to suspend proceedings as soon as it received Dr. Argun's report. In *Tomas*, the Court of Appeal held a trial court should have suspended proceedings upon receiving a doctor's report that the defendant was incompetent, even though the report was not made under oath. (*Id*. at p. 91.) *Tomas*, however, is distinguishable, as the trial court in that case retained the expert; here, defense counsel retained Dr. Argun. In any event, the sequence of events described above clearly shows the court was acting in good faith. Therefore, even if the court should have suspended proceedings earlier, its failure to do so does not indicate bias.

We also disagree with Gillard's suggestion that the trial court should have granted his request to withdraw his waiver of a jury trial. "It is well established that a waiver of a jury trial, voluntarily and regularly made, cannot afterward be withdrawn except in the discretion of the court. [Citations.] Absent special circumstances the court may deny a motion to withdraw such a waiver especially where adverse consequences will flow from the defendant's change of mind. In exercising its discretion the court may consider such matters as the timeliness of the motion to withdraw the waiver, the reason for the requested withdrawal and the possibility that undue delay of the trial or inconvenience to witnesses would result from granting the motion." (*People v. Chambers* (1972) 7 Cal.3d 666, 670–671.)

Here, the trial court reasonably refused Gillard's request to withdraw the waiver because it would have inconvenienced the witnesses and prospective jurors in the underlying trial. Gillard, moreover, failed to provide a compelling reason for the request; as discussed above, the record does not show the court had prejudged the competency issue or was otherwise biased. Gillard suggests the court's stated reasons were pretextual because it could have used the pre-existing pool of prospective jurors to decide the competency issue. Even if that were true, a jury trial on the competency issue still would have inconvenienced the witnesses by causing a significant delay in the underlying trial. Under these circumstances, the court's denial of Gillard's motion to withdraw the waiver was not an abuse of discretion and does not show bias.

2. ***The trial court did not deny Gillard his right to due process by refusing to sever the charges related to Abraham***

a. *Background*

Before trial, Gillard moved to sever the charges related to Abraham A. He argued the incident with Abraham was not sufficiently similar to the incidents with the Poly students, it was too remote in time, and the evidentiary case was significantly weaker than the other charges. The court denied Gillard's motion, finding he "failed to overcome the statutory preference for joinder and failed to establish that there is a substantial danger of prejudice that requires the charges be separately tried."

b. *Analysis*

Section 954 authorizes the joinder of charged offenses connected together in their commission or belonging to the same class of crimes. "[B]ecause consolidation or joinder of charged

22

offenses ordinarily promotes efficiency, that is the course of action preferred by the law." (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 (*Alcala*); see *People v. Manriquez* (2005) 37 Cal.4th 547, 574 (*Manriquez*) [" 'The law prefers consolidation of charges.' "].)  Offenses may be joined even if they " ' "do not relate to the same transaction and were committed at different times and places . . . against different victims." ' " (*Alcala*, at p. 1218, italics omitted.)

A trial court must grant a motion to sever joined charges if the defendant makes a clear showing of potential prejudice. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315.)  In deciding such a motion, a court must consider whether:  (1) evidence of the crimes would be cross-admissible in separate trials; (2) some of the charges are unusually likely to inflame the jury against the defendant; and (3) a " 'weak' " case has been joined with a " 'strong' " case so that the " 'spillover' " effect of aggregate evidence on several charges might alter the outcome of some or all of the charges.  (*Manriquez, supra*, 37 Cal.4th at p. 574; *People v. Kraft* (2000) 23 Cal.4th 978, 1030 (*Kraft*).)  "Because of the factors favoring joinder, a party seeking severance must make a stronger showing of potential prejudice than would be necessary to exclude other-crimes evidence in a severed trial." (*People v. Arias* (1996) 13 Cal.4th 92, 127; see *Alcala, supra*, 43 Cal.4th at p. 1221 [" 'The state's interest in joinder gives the court broader discretion in ruling on a motion for severance than it has in ruling on admissibility of evidence.' "].)

We review a trial court's denial of a motion to sever for an abuse of discretion.  (*Kraft, supra*, 23 Cal.4th at pp. 1030, 1032.) In doing so, we consider the record before the trial court when it made its ruling.  (*People v. Merriman* (2014) 60 Cal.4th 1, 37–38,

46–49; *People v. Soper* (2009) 45 Cal.4th 759, 774.) But even if a trial court's severance or joinder ruling is correct at the time it was made, we must reverse the judgment if the defendant shows joinder actually resulted in " 'gross unfairness' " amounting to a denial of due process. (*People v. Ybarra* (2016) 245 Cal.App.4th 1420, 1434 (*Ybarra*); *People v. Mendoza* (2000) 24 Cal.4th 130, 162.)

As Gillard seems to concede, the statutory requirements for joinder were satisfied in this case because all the charged offenses were of the same class. (*Kraft, supra*, 23 Cal.4th at p. 1030.) Gillard nevertheless insists the trial court should have granted his motion to sever the counts related to Abraham because they were unduly inflammatory and prejudicial. He contends that in the eyes of jurors, directing an 11-year-old boy to have sex with an adult is far worse than directing teenagers to have sex with each other. Once the jurors heard the allegations related to Abraham, Gillard argues, it was impossible for them to weigh the credibility of his other accusers fairly.

We are not convinced the jurors would have viewed the incident involving Abraham as being significantly more inflammatory than the incidents involving the Poly students. Initially, the age difference between Abraham and the other victims was not as substantial as Gillard suggests. Abraham testified that he was nearly 12 years old when Gillard directed him to have sex. Many of the other victims, including Kayla, Ivan, Adrian, and Andy, were 14 years old during some of the other charged incidents. An age difference of around two years is not particularly meaningful.

Gillard also overlooks that the incidents involving the Poly students were themselves quite inflammatory. The jury,

24

for example, heard Kayla testify that Gillard orally copulated and vaginally penetrated her while she cried and told him to stop. It also heard testimony that Gillard directed young teenagers to perform sexual acts while he watched, routinely groped Jaslyn and Kayla, and laughed when he saw Kayla was bleeding after having sex with another student at his direction. We cannot say the incident with Abraham was more inflammatory than any of these incidents.

We also reject Gillard's passing suggestion that the evidentiary case involving Abraham was significantly weaker than the cases involving the other victims. According to Gillard, the charges related to Abraham were particularly weak given the incident occurred nearly 30 years earlier, and Abraham did not tell anyone about it until very recently. On the latter point, Gillard is simply wrong; Abraham testified at trial that he told many people about the incident soon after it occurred. Moreover, although the incident took place several decades earlier, Abraham's testimony was detailed and compelling, and he had no obvious motivation to lie.[6] While there was certainly more evidence supporting some of the other charges, "[i]n order to demonstrate the potential for a prejudicial spillover effect, defendant must show an 'extreme disparity' in the strength or inflammatory character of the evidence." (*Ybarra, supra*, 245 Cal.App.4th at p. 1436.) Gillard has not met that burden here.

---

[6] Gillard presented evidence that Abraham's niece knew some of the Poly victims. He failed, however, to offer a compelling reason why that connection would lead Abraham to fabricate allegations against him.

On this record, the trial court did not abuse its discretion in denying Gillard's motion to sever.  Nor did joinder actually result in gross unfairness amounting to a denial of due process.

3.     ***The trial court did not violate Gillard's constitutional rights by excluding evidence of Abraham's robbery conviction***

a.     *Background*

Before trial, the prosecutor moved to exclude under Evidence Code section 352 evidence that Abraham was convicted of bank robbery in 1999, when he was 18 years old.  The prosecutor represented that Abraham was sentenced to three years of supervised release, which he successfully completed.[7]  She argued the probative value of the evidence for impeachment was slight and would necessitate the undue consumption of time, as the People would need to explain the

---

[7]     Gillard requests we take judicial notice of documents showing that, in addition to three years of supervised release, Abraham was sentenced to 30 months in prison and required to pay restitution.  We deny the request, as there is nothing in the record indicating either party presented the documents to the trial court.  (*People v. Preslie* (1977) 70 Cal.App.3d 486, 493 ["as a general rule the court should not take [judicial] notice if, upon examination of the entire record, it appears that the matter has not been presented to and considered by the trial court in the first instance"].)  Moreover, to the extent Gillard contends the prosecutor misrepresented Abraham's sentence, any error was harmless.  The prosecutor attached to her original motion a document showing Abraham was sentenced to 30 months in prison.  We presume the court reviewed this document before making its ruling, and nothing in the record suggests otherwise.  (See Evid. Code, § 664.)

circumstances of the offense and introduce evidence of Abraham's character for truthfulness. According to the prosecutor, Abraham became a pastor and completely turned his life around after the conviction.

Gillard responded that Abraham's conviction was admissible because robbery is a crime of moral turpitude and the conviction was not too remote in time. He argued that without evidence of the conviction, the jury would be deceived into believing Abraham is an honest and forthright individual who has lived a life free from felony conduct.

The trial court granted the prosecutor's motion and excluded the evidence. It noted the conviction was 20 years old, Abraham had since become a pastor, and he had not suffered any subsequent convictions.

b. *Analysis*

The California Constitution provides that "[a]ny prior felony conviction of any person in any criminal proceeding . . . shall subsequently be used without limitation for purposes of impeachment." (Cal. Const., art. I, § 28, subd. (f), par. (4).) The Supreme Court has interpreted this provision to authorize "the use of any felony conviction which necessarily involves moral turpitude," subject to the trial court's discretion under Evidence Code section 352. (*People v. Castro* (1985) 38 Cal.3d 301, 306.) Robbery is a crime of moral turpitude. (*People v. Stewart* (1985) 171 Cal.App.3d 59, 64.)

Evidence Code section 352 grants trial courts discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of

27

misleading the jury." (Evid. Code, § 352.) "[T]he latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler* (1992) 4 Cal.4th 284, 296.) Our Supreme Court has explained that, when the witness subject to impeachment is not the defendant, the trial court should pay particular attention to two factors: (1) whether the conviction reflects on honesty, and (2) whether the conviction is near in time. (*People v. Clair* (1992) 2 Cal.4th 629, 654 (*Clair*).)

We review a trial court's exclusion of impeachment evidence for an abuse of discretion. (*Clair, supra*, 2 Cal.4th at p. 655.) "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation] a reviewing court ordinarily will uphold the trial court's exercise of discretion." (*People v. Clark* (2011) 52 Cal.4th 856, 932.)

The trial court in this case acted within its broad discretion in excluding evidence of Abraham's conviction. While the fact that Abraham committed a robbery might reflect somewhat on his honesty generally, it said little about whether he specifically lied at trial about Gillard directing him to have sex with an older woman. This is especially true given the conviction was 20 years old and Abraham had not suffered any subsequent convictions. In contrast to the evidence's minimal probative value, there was considerable risk that its introduction would necessitate an undue consumption of time. The prosecutor represented that if the jury learned of Abraham's conviction, she would move to

28

introduce evidence explaining the circumstances of the robbery and Abraham's reformation.  On this record, the trial court did not abuse its discretion by excluding the evidence.

Gillard insists the court's exclusion of the conviction nevertheless violated his constitutional rights to due process, a fair trial, and confrontation.[8]  " 'As a general matter, the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." ' " (*People v. Boyette* (2002) 29 Cal.4th 381, 427–428.) Similarly, "reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination." (*People v. Brown* (2003) 31 Cal.4th 518, 545.) A trial court's exercise of discretion under Evidence Code section 352 amounts to a constitutional violation only if the prohibited cross-examination would have produced a " ' "significantly different impression of [the witnesses'] credibility." ' " (*People v. Virgil* (2011) 51 Cal.4th 1210, 1251.)

Gillard has not shown the court's exclusion of the conviction produced a significantly different impression of Abraham's credibility.  As discussed above, the fact that Abraham committed a robbery 20 years earlier said little about his credibility at trial.  The jury, moreover, was not under a

---

8       We reject the Attorney General's contention that Gillard forfeited his constitutional arguments by failing to raise them below.  Gillard merely invites us to draw alternative legal conclusions from the same information he presented to the trial court, which he is free to do on appeal. (*People v. Partida* (2005) 37 Cal.4th 428, 438.)

false impression that Abraham had lived an entirely virtuous life. Abraham acknowledged he had a troubled childhood, and the jury heard testimony that another wrestling coach prevented him and a group of boys from having sex with an intoxicated girl. The exclusion of Abraham's robbery conviction did not result in a significantly different impression of his credibility. Accordingly, Gillard's constitutional claims fail.

**4.** ***The prosecutor's discovery violations do not require reversal***

a. *Background*

In June 2017, Detective Victor Ruiz and other police officers interviewed numerous potential witnesses and victims. The next day, the prosecutor and Detective Ruiz together interviewed many of the same individuals. Before trial, the prosecutor provided Gillard recordings and transcripts of the police interviews, but she provided little information related to her subsequent interviews.

At trial, Gillard learned that Ivan, Jaslyn, and Andy disclosed to the prosecutor incidents they had not mentioned during their interviews with the police. Specifically, Ivan disclosed two incidents with Kayla, Jaslyn disclosed an incident with Miguel, and Andy disclosed two incidents with Kayla. At the time of trial, Gillard was aware of each incident; he did not know, however, that Ivan, Jaslyn, and Andy had previously disclosed them to the prosecutor.

The court instructed the prosecutor to immediately provide the defense summaries of each interview. It also precluded her from questioning Andy about the incidents with Kayla for five days so the defense could review the new material.

In addition, the court delayed the trial by a day, and it offered to give the defense additional time to conduct investigations.

Gillard moved for a mistrial due to the prosecutor's discovery violations. He argued the main issue at trial was witness credibility, and his defense strategy was to impeach witnesses based on their failure to disclose certain incidents before trial. Had he known about the additional interviews with the prosecutor, he would have settled the case or adopted a different trial strategy. For example, he might have focused on proving the prosecutor used suggestive questioning and tampered with the witnesses.

The court found the prosecutor violated section 1054.1 by not turning over witness statements to the defense. Nevertheless, it denied Gillard's motion for mistrial because his chances of receiving a fair trial had not been irreparably damaged. The court explained that the prosecutor disclosed the substance of each interview during trial; Gillard had ample opportunity to cross-examine every witness; the witnesses' statements during the interviews were inculpatory; and Gillard knew about each incident before trial. The court said it would give a jury instruction on the discovery violations if Gillard requested one. It would also consider granting another continuance.

At Gillard's request, the trial court instructed the jury as follows: "Both the People and the defense must disclose their evidence to the other side before trial within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] An attorney for the People failed to disclose Ivan, Jaslyn and Andy's statement[s] made

31

during the interview at the District Attorney's office the day after the police interview within the legal time period.  In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

      b.    *Analysis*

Under section 1054.1, the prosecutor must disclose to the defendant "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial . . . ." (§ 1054.1, subd. (f).)  Absent good cause, the prosecutor must disclose the information at least 30 days before trial or immediately if discovered or obtained within 30 days of trial.  (§ 1054.7.)

A court may make any order necessary to enforce section 1054.1, including requiring the immediate disclosure of information, delaying or prohibiting the testimony of a witness or the presentation of evidence, advising the jurors of an untimely disclosure, and continuing the case.  (§ 1054.5, subd. (b).)  A trial court must grant a mistrial in response to a discovery violation only if the defendant's chances of receiving a fair trial have been irreparably damaged.  (*People v. Ayala* (2000) 23 Cal.4th 225, 282; *People v. Hughes* (2020) 50 Cal.App.5th 257, 283 (*Hughes*).)

We review a trial court's refusal to grant a mistrial in response to a discovery violation for an abuse of discretion. (*Hughes*, *supra*, 50 Cal.App.5th at p. 283; see *People v. Wallace* (2008) 44 Cal.4th 1032, 1068 ["In reviewing rulings on motions for mistrial, we apply the deferential abuse of discretion standard."].)  Moreover, a prosecutor's violation of section 1054.1 is subject "to the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836, and thus is a basis for reversal only where it is reasonably probable, by state-law standards,

that the [violation] affected the trial result." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1135, fn. 13, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Where a prosecutor's discovery violation implicates a defendant's federal constitutional rights, we ask whether the error was harmless beyond a reasonable doubt. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 961.)

Here, the prosecutor's discovery violations were not prejudicial and the trial court acted within its discretion in denying Gillard's motion for mistrial. Before trial, Gillard was aware of each incident that Ivan, Jaslyn, and Andy testified to at trial. The only information he lacked was that these specific individuals disclosed the incidents to the prosecutor during pretrial interviews. While the revelation of this information undoubtedly affected Gillard's planned cross-examinations, it did not eviscerate his primary defense, which was that the witnesses fabricated the allegations for monetary gain. Instead, it opened the door to a new theory: that the witnesses' trial testimony was remarkably consistent in part because the prosecutor used suggestive questioning while interviewing them. Gillard presented extensive percipient and expert testimony in support of that theory, and he does not contend he could have presented more evidence or otherwise developed the defense further but for the prosecutor's untimely disclosures.

The trial court also took adequate measures to cure any potential prejudice. In addition to instructing the jury regarding the untimely disclosures, the court delayed Andy's testimony by several days and granted a short continuance of the trial. The court also indicated it would consider granting another continuance if Gillard requested one; tellingly, he did not do so.

33

(See *People v. Thompson* (2016) 1 Cal.5th 1043, 1103 [a defendant's failure to request a continuance upon receiving untimely discovery was fatal to her claim that the discovery violation was prejudicial].)

Under these circumstances, Gillard's chances of receiving a fair trial were not irreparably damaged by the prosecutor's discovery violations. The trial court, therefore, did not abuse its discretion by denying his motion for mistrial. For the same reasons, the discovery violations were harmless under both the state and federal standards.

5. ***The prosecutor's misconduct during rebuttal argument does not require reversal***

   a. *Background*

During a break in trial, the prosecutor moved to play a recording of Kayla's interview with police in order to show the officers did not use suggestive interviewing techniques. Gillard said he did not object to the prosecutor playing the recording, and he would stipulate that the police did not use suggestive or leading questions during their interviews. A few days later, Gillard informed the court he had changed his mind and would object to the prosecutor playing the recording. The court said it would rule on the issue at a later time.

Gillard called Detective Ruiz as a witness and asked him a number of questions about his initial interview with Kayla. At the start of her cross-examination, and while in front of the jury, the prosecutor announced she was renewing her motion to play the recording of Kayla's interview. Gillard objected and asked the court to strike the request. The court did not directly rule on the objection. The prosecutor then began her cross-examination of Detective Ruiz; she did not play the recording for the jury.

34

During her rebuttal argument, the prosecutor reminded the jury that she had moved to play Kayla's recording at trial. Gillard objected, and the court admonished the prosecutor to "argue the evidence . . . . Not any sustained objections, for example, if there was one at that point. I am not sure I recall that." The prosecutor remarked, "I wanted you [the jury] to hear that tape." Defense counsel again objected. The court responded that it did not know what the prosecutor planned to say, and it would strike the record if necessary.

The prosecutor then summarized Detective Ruiz's testimony about his interview with Kayla, after which she remarked, "the interview [with Detective Ruiz] was about— a little bit over an hour long. It was great. Okay? There was no suggestive questioning at all. Kayla just—it was like a book on tape. A sad book on tape." Gillard objected that the prosecutor was testifying, which the court overruled. The prosecutor continued: "And once this trial is done, if anybody wants to stay behind and listen to the tape, I will be more than happy to play the tape for you." The court sustained Gillard's objection.

While discussing the issue during a break, Gillard acknowledged that the prosecutor moved during trial to play the recording, but said it was "not a big deal" at the time. He argued the prosecutor's remarks during rebuttal, however, essentially signaled to the jury that he "is guilty. I have the evidence. . . . [Defense counsel] know[s] he is guilty. I can show you afterwards. Just convict him."

The court noted it was "disturbed" by the prosecutor's comments and it would decide any prosecutorial misconduct issues at a later time. After the break, the court admonished

the jury that the recording was not part of the evidence in the case and the prosecutor's invitation to listen to it after trial was improper.  The court told the jury not to speculate or consider any evidence that was not presented at trial.

In response to Gillard's subsequent motion for new trial, the court found the prosecutor committed inexcusable misconduct by inviting the jurors to listen to a recording of Kayla's interview after the trial.  Nonetheless, it found the misconduct was harmless beyond a reasonable doubt.  The court noted the prosecutor's remarks were brief, the evidence of Gillard's guilt was "overwhelming," and the jury returned guilty verdicts on 47 counts after deliberating only one day.

  b. *Analysis*

"A prosecutor commits misconduct by referring in argument to matters outside the record." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026; see *People v. Turner* (2004) 34 Cal.4th 406, 433 [a prosecutor is prohibited from " 'vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record' "].)  This is because "such statements 'tend[ ] to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination.  It has been recognized that such testimony, "although worthless as a matter of law, can be 'dynamite' to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence." [Citations.]' [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 827–828.)

We will reverse a judgment for prosecutorial misconduct only if the defendant shows prejudice.  (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.)  We evaluate prejudice under

*Chapman v. California* (1967) 386 U.S. 18 when federal rights are implicated, and under *People v. Watson* (1956) 46 Cal.2d 818 when only state law issues are involved. (*Fernandez*, at p. 564.) Under *Chapman*, we ask whether the prosecutor's conduct rendered Gillard's trial so fundamentally unfair that due process was violated, and under *Watson* we ask whether the prosecutor used deceptive or reprehensible methods to persuade the jury, making it reasonably probable that Gillard would have obtained a more favorable result without the alleged misconduct. (*Fernandez*, at p. 564; accord, *People v. Clark* (2021) 62 Cal.App.5th 939, 972.)

The Attorney General implicitly concedes, as he must, that the prosecutor engaged in misconduct by inviting the jurors to listen, after the trial concluded, to an audio recording of Kayla's interview. The prosecutor's remarks unmistakably conveyed that the recording, which was not in evidence, supported her case. As the trial court recognized, the prosecutor's conduct was both disturbing and inexcusable.

Nevertheless, reversal is not required because the misconduct was harmless under both the state and federal standards. When considered in the context of the entire trial, the potential prejudice from the prosecutor's remarks was minimal. The jury, for example, was already aware that the prosecutor wanted it to hear the recording, as she moved for its admission in open court. While the prosecutor should not have done so in front of the jury, Gillard acknowledged it was "not a big deal."

The prosecutor's remarks also did not convey that the recording was relevant to a contested issue. Although the prosecutor did not explicitly state why she wanted the jurors

to hear the recording, she implied it would show the police did not use suggestive questioning while interviewing Kayla. On that point, the jury heard Detective Ruiz testify that he did not ask Kayla any leading questions during her interview. Gillard did not challenge that testimony, nor did he seek to establish that the police ever used improper questioning. Instead, his theory was that the prosecutor used suggestive questioning when she interviewed witnesses the following day. The prosecutor's comments during rebuttal did not undercut that theory in any way. At most, they bolstered Detective Ruiz's testimony on what was essentially an uncontested point.

The court also mitigated any potential prejudice by offering a swift and strongly-worded admonition. After sustaining Gillard's objection, the court instructed the jurors that the prosecutor's remarks were improper and they should not speculate about the contents of the recording. We presume the jurors followed the court's admonition, which was sufficient to cure any harm. (See *People v. Tate* (2010) 49 Cal.4th 635, 688–689 ["given the fleeting nature of the prosecutor's remark, the court's admonition to the jury to disregard it was sufficient to cure any harm"].)

Under these circumstances, the prosecutor's misconduct did not render Gillard's trial so fundamentally unfair that due process was violated; nor is it reasonably probable that Gillard would have obtained a more favorable result without the misconduct. Accordingly, the misconduct does not require reversal.[9]

---

[9] To the extent Gillard contends the prosecutor engaged in other misconduct during her closing and rebuttal arguments, he forfeited the claims by failing to support them with meaningful

**6.**     *We reject Gillard's cumulative error contention*

Gillard contends the cumulative effect of all the errors at trial requires reversal.  "In examining a claim of cumulative error, the critical question is whether defendant received due process and a fair trial."  (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068; accord, *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.)  We are satisfied that Gillard received a trial that was fair and comported with due process.

## DISPOSITION

We affirm the judgement.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

                                                        EGERTON, J.

We concur:




        EDMON, P.J.                      VIRAMONTES, J.[*]

_____

analysis and citations to relevant authority.  (*People v. Oates* (2004) 32 Cal.4th 1048, 1068, fn. 10.)

[*]     Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.